## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

BROCK A. MARTIN,         :
                            :

      Plaintiff        :     No. 4:11-CV-02378
                            :

   vs.            :     (Judge Nealon)
                            :

CAROLYN W. COLVIN,[1]      :
ACTING COMMISSIONER OF   :
SOCIAL SECURITY,        :
                            :
     Defendant      :

**FILED**
**SCRANTON**

MAR 2 5 2014

PER _____

DEPUTY CLERK

### MEMORANDUM

The above-captioned action is one seeking review of a decision of the Commissioner of

Social Security ("Commissioner") denying Plaintiff Brock A. Martin's claim for social security

disability insurance benefits. The history of this matter is aptly laid out in the order of this Court

dated July 7, 2010, as follows:

> Martin was born in the United States on July 21, 1985. He graduated from
> high school in 2003 and during high school had vocational training as an
> automobile mechanic. He can read, write, understand and speak English and
> perform basic mathematical functions. Although he worked briefly in 2003, 2004
> and 2005, his earnings were insignificant and he has no prior relevant work
> experience for purposes of determining his entitlement to social security benefits.
> He has not worked since October 1, 2005.
> On February 16, 2006, Martin protectively filed applications for adult
> child disability insurance benefits and supplemental security income benefits
> alleging that he became disabled on October 1, 2005, as result of mental
> problems. Martin does not claim that he is disabled as the result of a physical
> impairment.
> On May 9, 2006, the Bureau of Disability Determination denied Martin's
> applications. On June 1, 2006, Martin requested a hearing before an
> administrative law judge. After approximately 13 months had passed, a hearing

---

1. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013, and is substituted for Michael J. Astrue as the Defendant in this case pursuant to Federal
Rule of Civil Procedure 25(d).

was held before an administrative law judge on July 9, 2007. On August 8, 2007, the administrative law judge issued a decision denying Martin's applications for benefits. On October 3, 2007, Martin filed an appeal of the administrative law judge's decision to the Appeals Council of the Social Security Administration. After over two years had passed, the Appeals Council on October 20, 2009, concluded that there was no basis upon which to grant Martin's request for review. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On December 23, 2009, Martin filed a complaint in this court requesting that we reverse the decision of the Commissioner denying him adult child disability insurance benefits and supplemental security income benefits.

Martin v. Astrue, 4:09-CV-2528, (Doc. 21, pp. 2-4) (M.D. Pa. 2010) (Muir, J.) (citations and footnotes omitted).

On July 7, 2010, Judge Muir, in deciding to vacate the decision of the Commissioner and remand the case for further proceedings, determined that the Administrative Law Judge ("ALJ") committed a legal and factual error by failing to consider or to adequately explain the discounting of a bipolar disorder diagnosis, and "failing to make a finding as to whether or not bipolar disorder was a medically determinable mental impairment in Martin." Id. at 13-15. The Court noted that the record reflected that Rakesh Sharma, M.D., a psychiatrist and medical director of Northeast Counseling Services, Nanticoke, Pennsylvania, on multiple occasions diagnosed Martin with bipolar disorder. Id. at 11. It was determined that the failure of the ALJ to either accept or reject the diagnosis of bipolar disorder was error. Id. at 13.

On November 30, 2010, a remand hearing was held before the same ALJ, Therese A. Hardiman, in Wilkes-Barre, Pennsylvania. Tr. 499-517.[2] On January 11, 2011, ALJ Hardiman denied Martin's claims, concluding he has not been under a disability within the meaning of the

---

2. References to "Tr.___" are to pages of the administrative record filed by the Defendant on April 10, 2012. (Doc. 9).

Social Security Act. Tr. 332-347. Administrative Appeals Judge, Christopher R. Field, denied

Martin's request for review informing that "[t]he Appeals Council has concluded that a basis for

assuming jurisdiction of this case has not been presented" and that "the [ALJ] complied with the

District Court's Order and fully considered and evaluated the evidence and reached the

appropriate conclusions on the issues." Tr. 321.

On December 28, 2011, Martin instigated this appeal[3] by filing a complaint. (Doc. 1).

On April 10, 2012, Defendant filed an answer and a transcript of the entire record of proceedings.

(Docs. 8-9). The parties have filed briefs and the matter is now ripe for disposition. See (Docs.

12, 14, & 18). For the reasons that follow, the ALJ's decision will be affirmed.

**Standard of Review**

This Court has jurisdiction of appeals of final determinations of the Commissioner of

Social Security pursuant to 42 U.S.C. § 405(g). When considering a social security appeal, the

court has plenary review of all legal issues decided by the Commissioner. See Poulos v.

Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858

(3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to

42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial

evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845

F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence

---

3. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social
Security Administration denying a claim for social security disability benefits" is "adjudicated as
an appeal." M.D.Pa. Local Rule 83.40.1.

must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)

("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those

findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642

F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive

by a reviewing court if supported by substantial evidence."); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176

(4th Cir. 2001); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Martin v. Sullivan</u>, 894 F.2d

1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but

'rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (quoting <u>Consolidated Edison Co.</u>

<u>v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d

198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial

evidence has been described as more than a mere scintilla of evidence but less than a

preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record, substantial

evidence may be "something less than the weight of the evidence, and the possibility of drawing

two inconsistent conclusions from the evidence does not prevent an administrative agency's

finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime</u>

<u>Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record,"

<u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from

its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of

evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails

to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court

reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v.

Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir.

1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in the national
> economy" means work which exists in significant numbers either in the region
> where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability insurance and

supplemental security income claims.  See 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920;

5

Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the ALJ must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Record**[4]

On December 17, 1994, when Martin was nine (9) years old, he was treated for headaches and Dr. Yu-Song Kao noted he "tends to sleep a lot and has photophobia and need [sic] to lay in

---

4. This summary of the medical records focuses on Martin's history of prescription medication and compliance therewith, which is germane to this appeal.

dark and quiet room." Tr. 144.   An October 23, 1997 (age 12), Northeast Counseling Services

Psychiatric Evaluation noted depression, anxiety, and antisocial behavior.   Tr. 157.   A December

22, 1997 Evaluation indicated Depressive Disorder and he was continued on Buspar "to be

monitored and titrated as necessary." Tr. 166.

On October 10, 2002, in a medication review, Staff Psychiatrist Mukundam Veerabathini

noted a history of schizoaffective disorder, that Martin stopped his Risperdal on his own and that

he was advised to take his Risperdal, and that he is taking Effexor XR "on and off." Tr. 189.

A progress note dated April 4, 2003 states, "[s]ince last update, pt has been not taking any

medication which was formerly used by pt and prescribed by - pt has been able to eliminate any

of the complaints that he had with the medication - making him feel sleepy or unmotivated to

participate in leisure activities or school work." Tr. 185.

An August 21, 2003 Clinical Psychological Evaluation, when Martin was eighteen (18)

years of age, noted "Brock has an extensive mental health history . . . and has been on various

medications since his early adolescence" and "recalls several without good effect, including

Prozac and Risperdal." Tr. 193.   He had a GAF[5] score of 65.   Tr. 196.   Examining Psychologist

_____

5. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's
overall psychological, social and occupational functioning, in order to assess the person's mental
health illness.  American Psychiatric Association (2000).  Diagnostic and Statistical Manual of
Mental Disorders (4th ed., text rev.).  Washington, DC: Author.  A GAF score is set within a
particular range if either the symptom severity or the level of functioning falls within that range.
Id.  The score is useful in planning treatment and predicting outcomes.  Id.  The GAF rating is the
single value that best reflects the individual's overall functioning at the time of examination.  The
rating, however, has two components: (1) symptom severity and (2) social and occupational
functioning.  The GAF is within a particular range if either the symptom severity or the social
and occupational level of functioning falls within that range.  When the individual's symptom
severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus,

Paul Taren, noted Martin "has been off psychotropic medications for several months now." Tr. 197. He recommended Martin continue with outpatient therapy. Tr. 197.

On September 8, 2003, Psychologist John Grutkowski noted that Martin had not required medication since November 15, 2002 and had been treating through counseling and reflected progress. Tr. 216.

Martin was admitted to First Hospital of Wyoming Valley on October 4, 2005 and treated for major depression; he was discharged on October 21, 2005. Tr. 219. Multiple medications "were tried" including Desyrel increased to 300 mg at bedtime; Paxil CR 25 mg in the morning; and Depakote ER 1500 mg at bedtime. Tr. 219. "Medication teaching was done prior to discharge and he was aware of the risks/benefits of taking it and the patient gave verbal consent to same." Tr. 219. Martin was "encouraged to continue current medication as is since it seems to be beneficial." Tr. 219.

On October 24, 2005 Northeast Counseling Services conducted an Initial Psychiatric Evaluation where Martin was diagnosed with, among other things, Major Depression and a GAF score of 60 was assessed. Tr. 243 & 490. Martin was on Depakote ER 1500 mg hs, Paxil ER 25

---

a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. Id. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. Id.

mg in the morning, Desyrel 300 mg daily which was reduced to 150 mg hs due to complaints of drowsiness. Tr. 243 & 491. Martin was referred to outpatient services and expressed an understanding of the side effects of his medications, the importance of taking his medications and avoiding alcohol. Tr. 243 & 491. In the initial evaluation, it was noted that Martin decided to go off his medication on his own and Martin stated that he stopped taking his medication thinking that he could take care of things on his own but then fell into depression and isolation. Tr. 244 & 491. The evaluation also indicated a history of drug and alcohol use. Tr. 244 & 491.

The October 31, 2005, Northeast Counseling Services Evaluation noted a current GAF score of 55. Tr. 229.

The November 14, 2005 Northeast Counseling Services Medication Management Report (MMR) notes that Bipolar Illness should be considered and that there has been failure of treatment with anti-depressants. Tr. 240 & 479. Martin was irritated, angry and depressed. Tr. 240 & 479. At this visit, Paxil was decreased to 12.5 mg daily for four days and then discontinued and Trazodone was also discontinued, and Seroquel 100mg hs was used to augment the Depakote. Tr. 240 & 479.

The November 25, 2005 MMR indicates Martin was on Depakote ER 1500 mg and Seroquel 100 mg at bedtime and felt that the medicine was helping somewhat. Tr. 239 & 478. He reported less anxiety since being off of the Paxil but continued mood swings. Tr. 239 & 478. Martin was continued on Depakote and Seroquel was increased to 200 mg at bedtime. Tr. 239 & 478.

The December 23, 2005 MMR indicates Martin was on Depakote ER 1500 mg and Seroquel 200 mg at bedtime but that he stopped Seroquel 200 mg because it did not help and kept him up all night. Tr. 238 & 477.  Martin said he felt awful and too hungry and absolutely refused to take Seroquel and he "refuses to consider partial hospitalization service because 'I don't do groups'." Tr. 238 & 477.

The January 18, 2006 MMR notes that Martin was "happy to be off the Seroquel because it made him irritable." Tr. 237 & 476.  He was treating his Bipolar Disorder with Depakote ER 1500 mg at bedtime. Tr. 237 & 476.  Martin was remained on Depakote at the current dose until his EKG was reviewed, at which time he was to be considered for Geodon. Tr. 237 & 476.

On February 8, 2006, Martin was diagnosed with Bipolar Disorder and it was noted that he was taking Depakote ER 1500 mg at bedtime and that some days were "not to [sic] bad" but that he still got aggravated. Tr. 235 & 475.  Due to mood instability, depression and irritability, the Depakote ER was increased to 2000 mg. Tr. 235 & 475.  On February 22, 2006, Martin did not show for his scheduled medication management. Tr. 236 & 474.  On February 24, 2006, Martin's medication was changed in that two prescriptions were discontinued and one was increased. Tr. 231.  On March 21, 2006, it is noted that Martin's diagnosis was Bipolar Disorder and he was on Depakote ER 2000 mg at bedtime and that "some days are good and some days are bad and that he still gets aggravated at times." Tr. 234 & 473.  He never had the EKG done because it was not scheduled. Tr. 234 & 473.  He was continued on Depakote. Tr. 234 & 473.

On April 25, 2006, Martin refused a referral to a podiatrist for an ingrown toenail. Tr. 277.

10

The June 2, 2006 MMR indicates Martin hasn't taken Depakote since issued in March because he was gaining too much weight and that he was given a script for blood work but he lost it. Tr. 302 & 472.  He was given a second script for blood work so that he could start on different medication.  Tr. 302 & 472.

On July 10, 2006, it was noted that an appointment with a heart specialist was discussed but that Martin never made an appointment.  Tr. 273.

The July 25, 2006 MMR indicates Martin was not on medication and he reported being more paranoid and anxious and medication was withheld until the EKG and cardiac evaluation were reviewed.  Tr. 301 & 471.  On August 15, 2006, Martin did not arrive for his scheduled Medication Management appointment.  Tr. 303 & 470.  The September 13, 2006 MMR indicates that Martin was seen for an EKG and cardiac evaluation about a month prior and that those reports needed to be evaluated before initiating medication.  Tr. 297 & 488.  The October 4, 2006 MMR indicates cardiac evaluations had not been reviewed.  Tr. 298 & 487.  Martin refused to consider partial hospitalization services.  Tr. 298 & 487.  The October 24, 2006 MMR indicates Martin, who was taking no medication at the time, continued to wait for review of the cardiac evaluations.  Tr. 299 & 486.

The November 20, 2006 MMR indicates Martin was recently started on Abilify 10 mg daily which he reported helps him with agitation but he still felt paranoid so the Abilify was increased to 15 mg daily.  Tr. 300 & 485.  The December 12, 2006 MMR indicates the Abilify 15 mg in the morning had him feeling more motivated but still paranoid so it was increased to 20 mg.  Tr. 296 & 484.  The January 3, 2007 MMR indicates that Martin felt he was doing well on

11

the Abilify 20 mg in the morning but still felt paranoid so it was increased to 25 mg. Tr. 295 & 483. The January 24, 2007 MMR indicates the Abilify 25 mg in the morning helped with aggravation but not paranoid thoughts; the Abilify was increased to 30 mg in the morning and Benadryl 25 mg was added at bedtime to target insomnia. Tr. 294 & 482.

On March 13, 2007, it was noted that Martin was depressed, not taking his medications but seeing his counselor twice per month. Tr. 269. The March 23, 2007 MMR notes Martin did not pick up his medication. Tr. 293 & 481. Martin admitted smoking marijuana and, since he now had insurance and could afford medication, agreed to consider Risperdal 2 mg at bedtime. Tr. 293 & 481.

The April 25, 2007 MMR indicates Martin stopped taking Restoril 2 mg at bedtime because it was causing him to be too sedated and sleepy. Tr. 292 & 480. Restoril was discontinued and Navane 2 mg three times a day was started and a consultation with Dr. Sharma was ordered. Tr. 292. The MMR of May 5, 2007 notes Martin was on Navane 2 mg three times a day which "seems to be helping some," making him feel "somewhat calmer with the medication and somewhat less paranoid." Tr. 291 & 469. He reported trouble with his afternoon dose of medication because at times he was working. Tr. 291 & 469. The Navane was changed to 5 mg twice a day because the three times a day dosing was difficult to remember. Tr. 291 & 469. The May 5, 2007 MMR indicates Martin was on Navane 2 mg three times a day which seemed to be helping. Tr. 469. The Navane dosage was changed to 5 mg twice a day since TID dosing is difficult for Martin to remember. Tr. 469.

The July 17, 2007 MMR indicates Martin was on Navane 5 mg twice a day but that Martin discontinued it 2 to 3 weeks ago due to increased irritability. Tr. 468. Martin's increased symptoms were believed to be due to his poor compliance regarding medication and he was prescribed Trilafon 4 mg at bedtime. Tr. 468.

The August 10, 2007 MMR indicates Martin was on Trilafon 4 mg at bedtime for only the previous two weeks because he had difficulty at his pharmacy. Tr. 467. Martin stated this was the first medication that had not caused aggravation. Tr. 467. Martin stated he did not want an increase in medication but the Trilafon was changed to 8 mg ½ tablet at bedtime for cost purposes. Tr. 467.

The August 24, 2007 MMR indicates Martin had not taken his medications for the last two weeks as he had been feeling sick but that the Trilafon was helping with paranoia. Tr. 466. He informed that he lost his insurance and would not be able to afford Trilafon and so he was given samples of Invega 3 mg daily and informed to bring paperwork to reestablish his insurance. Tr. 466.

The September 7, 2007 MMR indicates that Martin had no side effects to Invega which was started at 3 mg daily. Tr. 465. Invega was increased to 6 mg daily and he was to follow-up with outpatient therapy. Tr. 465.

The September 28, 2007 MMR indicates poor medication compliance at times and that Martin was worried the meds would make him anxious. Tr. 464. He was continued on his current medication and a GAF score of 60 was assessed. Tr. 464.

13

Martin did not arrive at his October 19, 2007 and December 21, 2007 scheduled MM appointments.  Tr. 462-63.

The January 21, 2008 MMR indicates Martin was doing okay on Invega but that he had been out of medication for a few months, so he was restarted on Invega 6 mg daily.  Tr. 461.

The February 11, 2008 MMR indicates Martin was taking his meds and doing okay so no changes were made.  Tr. 460.  Martin indicated that this medication had helped him the most so far.  Tr. 460.

The March 10, 2008 MMR indicates Martin reported the medication was helping so no changes were made.  Tr. 459.

The March 24, 2008 MMR indicates Martin was doing well with his medication and not reporting any side effects so he was continued on his current medication.  Tr. 458.

The April 24, 2008 MMR indicates Martin reported doing somewhat better on Invega and wanted no medication change so he was continued on his current medications.  Tr. 457.

The June 9, 2008 MMR indicates Martin was doing okay and he denied side effects so his current medications were continued.  Tr. 456.

The July 7, 2008 MMR indicates Martin was okay on his current medication and wanted no medication adjustment so his current medications were continued.  Tr. 455.

The July 30, 2008 MMR indicates Martin was doing well with no side effects and it was noted that Invega worked fairly well.  Tr. 454.  He was continued on Invega and started on Lexapro.  Tr. 454.

The August 29, 2008 MMR indicates Martin was feeling better, that he had not started Lexapro and that he actually "forgot it" and believed he did not need it.  Tr. 453.  He was

continued on Invega and discontinued Lexapro as it was not started because he forgot about it. Tr. 453.

The October 10, 2008 MMR indicates Martin was feeling okay and was working. Tr. 452. He was continued on Invega and Lexapro was started again. Tr. 452.

The November 6, 2008 MMR indicates Invega was helping but Martin did not take Lexapro and did not feel he needed it. Tr. 451. Invega was continued and Lexapro was discontinued as Martin did not feel an antidepressant was necessary. Tr. 451.

The November 24, 2008 MMR indicates Martin was doing fairly well with Invega although he was still getting paranoid. Tr. 450. He had been able to work as a dishwasher and was not reporting any depressed moods. Tr. 450. He was continued on therapy and with Invega 6 mg daily. Tr. 450.

The January 5, 2009 MMR indicates Martin was doing okay, he denied side effects, and he stated this was the only medication that ever helped him some and he stated that he felt therapy was helping. Tr. 449. He was continued on his current medication. Tr. 449.

The January 30, 2009 MMR indicates Martin was doing fine on his current medication and wanted no additional medication. Tr. 448.

The March 2, 2009 MMR indicates Martin was doing okay and wanted no medication change. Tr. 447.

The April 4, 2009 MMR indicates Martin was having no major side effects and felt therapy was helping so he was continued on his current medication. Tr. 446.

The May 11, 2009 MMR indicates Martin was currently on Invega which had decreased his paranoia but made him irritable; he was continued on Invega 6 mg daily. Tr. 444-45.

The June 8, 2009 MMR indicates Martin reported he was doing okay and denied medication side effects so he was continued on his current medication. Tr. 443.

Martin did not arrive for his July 6, 2009 MM appointment. Tr. 442.

The July 11, 2009 MMR indicates Martin stated he had not taken his medication as he could not afford it. Tr. 441. Invega was discontinued as Martin desired to try being off of his medication and continued on outpatient therapy. Tr. 441.

The October 26, 2009 MMR indicates Martin was not taking medication because it made him restless and agitated but was doing much better and therapy had helped him and he had been able to work for a year. Tr. 489. Martin was continued on just therapy at his request. Tr. 489.

The June 11, 2010 MMR indicates Martin stated he did not like taking pills, that he was doing well, still working and playing guitar, and therapy had been very helpful. Tr. 440. Since he refused to take any medication, he was continued on therapy. Tr. 440.

The October 4, 2010 MMR indicates Martin was not currently taking mediation but was coming for therapy and he stated he would find a job. Tr. 439. Martin indicated he did not wish to be on any medication but desired continued therapy. Tr. 439.

The November 18, 2010 MMR indicates Martin did not like to take medication but was agreeable due to depressed feelings and paranoid thoughts and was started on Seroquel. Tr. 438.

**ALJ Decision**

In the January 11, 2011 denial, ALJ Hardiman conducted the five-step sequential evaluation process. Tr. 336-346. The following findings were made: 1) Martin attained the age of 22 on July 21, 2007; 2) Martin engaged in substantial gainful activity after October 1, 2005 (the alleged onset date), namely working as a dishwasher from 2009 until September 27, 2010; 3) Martin has "the following severe[6] impairments: major depressive disorder, bipolar disorder, mood/dysthymic disorder, learning disability, chronic cannabis use, and personality disorder (20 CFR 404.1520(c) and 416.920(c)), " and "these impairments have more than a minimal impact on the claimant's ability to perform some work-related activities and therefore, they are severe" but "despite their severity, these impairments are not completely disabling;" (4) Martin "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments;" (5) Martin has the residual functional capacity to perform a full range of work at all exertional levels but "limited to simple routine tasks, low stress as defined as only occasional decision making and only occasional changes in the work setting, no interaction with the public and only occasional limited amount of interaction with co-workers;" (6) Martin can perform past relevant work as a dishwasher as well as other work and is "not disabled;" and (7)

---

6. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 404.1521 and 416.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

Martin has not been under a disability from October 1, 2005 through the date of the ALJ decision. Tr. 338-347.

## Arguments

Martin maintains that the ALJ first erred by failing to develop a complete record or address the directive given in Judge Muir's remand order. (Doc. 12, p. 6). Martin sets forth sections of the hearing transcript and notes that the ALJ never questioned Martin or his mother or "showed any interest" in Martin's ongoing issues. (Doc. 12, pp. 7-10). Martin argues that the ALJ never addressed the diagnosis of "Bipolar Disorder, with psychotic features" or its relation to Martin's condition and the ALJ's reliance on the treatment notes establishes the ALJ's findings were predetermined before the hearing. (Doc. 12, pp. 10-11). Martin submits that the ALJ failed to address or consider "anosognosia" for Martin's failure to take his medicine and that the "ALJ had made her own psychiatric diagnosis of Plaintiff and anything not fitting her diagnosis was minimized or ignored." (Doc. 12, p. 11).

Martin believes the ALJ also erred by substituting her own opinion for that of a psychiatrist. (Doc. 12, pp. 11-13). Martin believes that the ALJ improperly "anchored" her decision on Martin's failure to take his medication, failed to take into account the records' reflection of Plaintiff's consistent but not perfect adherence to a range of medications, and failed to account for "the fact that medications change," and "that the treatment of mental illness is not a one time, one size fits all cure." (Doc. 12, p. 12). Martin argues that the ALJ's "opinion that Plaintiff's symptoms, periods of decomposition, and work place issues are all due to medication compliance and nothing else is her opinion not a psychiatric opinion." (Doc. 12, p. 12).

Additionally, Martin sets forth that the ALJ had a duty to and failed to set forth a complete record and "never factored in a learning disability diagnosis, psychosis or the likelihood of off task behavior due to the multiple diagnosis and range of factors in Plaintiff's case including medications losing their therapeutic effect over time or changing symptoms." (Doc. 12, p. 13).

Citing an article provided by the Treatment Advocacy Center, Martin analyzes anosognosia[7] to denote a person's lack of awareness of his/her illness. (Doc. 12, p. 13). Martin argues that the ALJ erred by not raising "off task behavior" with the vocational expert and failing "to place this before the vocational expert is itself error since an ALJ is not free to ignore pertinent limitations that apply and in posing a hypothetical question to an expert all pertinent limitations must be included." (Doc. 12, p. 14), citing Burns v. Barnhart, 312 F.3d 113 (3rd Cir. 2002). Martin submits that the ALJ crafted the hearing to "mousetrap" him by not affording him an opportunity to address his failure to take medications while drawing inferences about his symptoms and their functional effects from his nonadherence to psychiatric treatment. (Doc. 12, p. 14).

In response, Defendant asserts that the ALJ's decision that Martin is not disabled is supported by substantial evidence and should be affirmed. (Doc. 14, p. 21). Defendant highlights that the ALJ gave Plaintiff's counsel an adequate opportunity to question Martin, his mother and the vocational expert, and develop the record, and Defendant argues that it is "disingenuous for him to now argue that the ALJ did not take sufficient testimony regarding Plaintiff's current symptoms, daily activities, and medication side effects." (Doc. 14, pp. 11-12),

---

7. Anosognosia is the apparent denial or unawareness of one's own neurological defect. TABER'S CYCLOPEDIC MEDICAL DICTIONARY 128 (19th ed. 2001).

citing <u>Glenn v. Sec. of Health and Human Servs.</u>, 814 F.2d 387, 391 (7th Cir. 1987) (stating that

when an applicant is represented by counsel, an ALJ may assume that he is making his strongest

case for benefits). Secondly, Defendant submits that the ALJ's decision demonstrates she

complied with Judge Muir's order and considered Martin's diagnosis of bipolar disorder finding

it to be a severe impairment at step two of the sequential evaluation process. (Doc. 14, pp. 12-

13).

Defendant also contends that the ALJ complied with the regulations and relevant rulings

in considering Martin's noncompliance with his medication regimen and that "[n]othing in the

ALJ's decision suggests that the ALJ would have found Plaintiff to be disabled, but for his

medication non-compliance." (Doc. 14, p. 14). Defendant points out that "the ALJ noted that,

even during periods of noncompliance, Plaintiff's GAF ratings demonstrated that he had only

moderate psychological symptoms," and that Martin's "treating psychiatrist still reported only

moderate symptoms during periods of noncompliance and Plaintiff was even able to hold a

full-time job as a dishwasher during one such period." (Doc. 14, pp. 15-16).

Lastly, Defendant asserts that the ALJ did not improperly substitute her own opinion for

that of a psychiatrist but that the ALJ, as she is specifically charged to do, considered all of the

evidence and reached her own, independent conclusion about Martin's residual functional

capacity. (Doc. 14, p. 17). Defendant points out that the ALJ reviewed the extensive treatment

records, Martin's subjective complaints, and his mother's testimony regarding his symptoms and

limitations. (Doc. 14, p. 17). Defendant submits that the ALJ properly considered Martin's

failure to take his medication in assessing his credibility and that there was no evidence of record

that Martin's mental illness caused him to be incapable of adhering to his medication regimen. (Doc. 14, p. 19). Defendant notes that the record establishes that Plaintiff elected to go without his medication and treat with therapy only, that "overall his moods have been good," and he was able to hold a job as a dishwasher[8], be in crowds, and take guitar lessons." (Doc. 14, p. 20). Defendant argues there is nothing in the record that supports a finding that Martin was incapable of making an informed decision about whether or not to take medication nor anything to support that he was incapable of adhering to a medication regimen, and, accordingly, the ALJ was not required to consider such an incapability in assessing Plaintiff's credibility. (Doc. 14, p. 20).

In reply and in an attempt to substantiate his position that the issue of medication non-compliance was the lynchpin of the entire ALJ decision, Plaintiff sets forth specific language from the ALJ's decision which the ALJ chose to highlight. (Doc. 18, pp. 1-4). Plaintiff submits that the relevant question here, whether his failure or refusal to follow a prescribed treatment was a manifestation of his disease, was only raised in the ALJ's decision and no record was established or created on the issue. (Doc. 18, pp. 5-6). Plaintiff highlights language from the ALJ that reflects the ALJ's belief that Martin chose of his own free will not to take his medication, which Plaintiff alleges was an approach rejected by the United States Court of Appeals for the Eighth Circuit. (Doc. 18, pp. 6-7), citing Pate-Fires v. Astrue, 564 F. 3d 935 (8th Cir. 2009). Plaintiff feels his right to a full and fair hearing was violated because, despite the ALJ's highlighting the "pivotal issue of medication compliance" in her decision, she

---

8. The record reflects that Martin is 28 years of age and had "insignificant" earnings in 2003, 2004 and 2005, and since October 1, 2005, his only work was as a dishwasher from November of 2008 until September of 2010. See Tr. 503.

never questioned Plaintiff or his mother regarding medication compliance. (Doc. 18, pp. 7-8).

Plaintiff argues "the ALJ by her written decision and her reticence at [the] hearing did not meet

her obligation to fully and fairly develop the record" but "crafted the hearing and her decision to

'mousetrap' the Plaintiff by knowing in advance what her decision rationale would be and by not

affording Plaintiff any opportunity at [the] hearing to address her concerns about Plaintiff's

compliance with medication." (Doc. 18, pp. 8-9).  Plaintiff requests reversal or a new hearing

submitting that "[g]iven the initial denial, the remand order of Judge Muir, the records supplied

for the second hearing, and the fact the ALJ did not raise the medical compliance issue in the first

hearing but crafted her second denial on that issue even citing treatment dates occurring before

the first hearing without raising it at the second hearing, a pattern emerges that demonstrates a

violation of due process and fundamental fairness." (Doc. 18, p. 9).

**Discussion**

The administrative record in this case is 517 pages in length consisting of, inter alia,

vocational and medical records, and hearing transcripts and decisions.  (Doc. 9).  The court has

thoroughly reviewed that record and the briefs and exhibits filed by the parties.  The ALJ's

factual determinations are supported by substantial evidence, namely, the medical records and the

testimony of the vocational expert.  The ALJ aptly cites the medical records and explains her

credibility determinations.  Tr. 340-345.

All of Martin's arguments are based on the position that his failure to take his medication

is a condition of his illness, or anosognosia.  Federal Courts have recognized anosognosia as a

potential condition of schizophrenia and bipolar disorder.  See Bohannon v. Colvin, 2013 U.S.

Dist. LEXIS 131261, *6-7 (W.D. Ark. 2013) (Marschewski, M.J.) (recognizing that it was not uncommon for patients suffering from bipolar disorder to discontinue their medications and also suffer from anosognosia as a manifestation of the illness which "predisposes the individual to noncompliance with treatment and has been found to be predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness;" remanding because the ALJ should have taken this into consideration because the ALJ rejected plaintiff's subjective complaints on the basis of plaintiff's failure to take his medication; and directing the ALJ to question plaintiff's treating physician regarding the cause of plaintiff's failure to take his medication); see also Mussi v. Astrue, 744 F. Supp. 2d 390, 400 n.18 (W.D. Pa. 2010) (defining anosognosia as the inability to recognize portions of one's own body, or physical deficits or paralysis in portions of one's own body).  Other Federal Courts, while not utilizing the term anosognosia, have noted that noncompliance with prescribed medication can be a medically-determinable symptom of mental illness. Pates-Fires, 564 F.3d at 945-47; see also Mendez v. Chater, 943 F. Supp. 503, 508 (E.D. Pa. 1996); Frankhauser v. Barnhart, 403 F. Supp. 2d 261, 277-78 (W.D.N.Y. 2005); Benedict v. Heckler, 593 F. Supp. 755, 761 (E.D. N.Y. 1984).

The record reflects that Martin has a long history of dynamic prescription medication treatment.  Further, the medical records indicate a myriad of reasons for Martin's failure to comply with his prescription regimen including: the medicine was "making him feel sleepy or unmotivated," (Tr. 185); he thought "he could take care of things on his own," (Tr. 244 & 491); Martin did not "feel that it helped and it kept him up all night long" and "he felt awful and too

hungry," (Tr. 238 & 477); "he was gaining too much weight," (Tr. 302 & 472); a three times a

day dosage creates a problem because "at times he is working" and it "is difficult for him to

remember," (Tr. 291 & 469); he was "worried that med will make him anxious," (Tr. 464); he

"'forgot' & doesn't feel he needs it," (Tr. 453); "he was feeling very restless and it made him

more agitated," (Tr. 489); and Martin did not like medications and desired to be off of them and

continuing with just therapy, (Tr. 438-40). The medical records also reflect periods of

compliance and indications from Martin that the medicine was effective. See (Tr. 442-60, 465-

677). There is no medical opinion or indication in any of the medical records that Martin's

failure to comply with his prescriptions was a result or symptom of his illness. Further, there is

no testimony from an expert or lay witness to that effect.

Plaintiff's primary argument is that the ALJ did not develop a complete record by failing

to question Plaintiff and his mother about, inter alia, his symptoms, medications, and

"anosognosia." (Doc. 12, pp. 6-11). A critical requirement is that the Commissioner adequately

develop the record. Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Boone v.

Barnhart, 353 F.3d 203, 208 n.11 (3d Cir. 2003) (ALJ had a duty to follow up on claimant's

counsel's question/inquiry because it raised an issue.); Ventura v. Shalala, 55 F.3d 900, 902 (3d

Cir. 1995) (The ALJ has "a duty to develop a full and fair record in social security cases."); Reed

v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433, 437 (7th Cir.

2000); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) ("The ALJ has an obligation to develop

the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the

claimant is represented by counsel."); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); see

also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]").  The requirement that the ALJ fully develop the record "is most critical in situations in which social security claimants are not represented by counsel and thus may not be capable of putting the best face on their claims, but it is equally applicable where lawyers are handling the case." Rutherford, 399 F.3d at 557.  However, this requirement "is most acute where the claimant is unrepresented." Turby v. Barnhart, 54 Fed. Appx. 118, 122 (3d Cir. 2002), citing Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980).

"While an ALJ is required to assist the claimant in developing a full record, he or she has no such obligation to 'make a case' for every claimant." Kenyon v. Colvin, 2013 U.S. Dist. LEXIS 175897, *13-14 (M.D. Pa. 2013).  The burden still "lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition." Money v. Barnhart, 91 Fed. Appx. 210, 215 (3d Cir. 2004), citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987), and 20 C.F.R. §§ 404.1512(a) and 416.912(a).  Claimant's counsel has a responsibility to ensure the ALJ was aware of and the record reflects any facts favorable to the claim for benefits. Turby, 54 Fed. Appx. at 122-23, citing  20 C.F.R. § 404.1740(b)(1) (stating that counsel is "obligated to assist the claimant in bringing to [the Administration's] attention everything that shows that the claimant is disabled').

This matter was remanded to make a finding regarding the existence or nonexistence of bipolar disorder and to "appropriately evaluate the medical evidence and the credibility of Brock

A. Martin" in accordance with that finding. <u>Brock v. Astrue</u>, 4:09-CV-2528, (Doc. 21, pp. 14-15) (M.D. Pa. 2010) (Muir, J.). A review of the ALJ's analysis indicates a thorough medical record review was conducted and credibility determinations regarding Martin and his mother were made. Tr. 340-45. Also, a letter by Martin's mother was considered by the ALJ. Tr. 344. The ALJ determined that Martin has "the following severe impairments: major depressive disorder, <u>bipolar disorder</u>, mood/dysthymic disorder, learning disability, chronic cannabis use, and personality disorder (20 CFR 404.1520(c) and 416.920(c))," and "these impairments have more than a minimal impact on the claimant's ability to perform some work-related activities and therefore, they are severe" but "despite their severity, these impairments are not completely disabling." Tr. 338 (emphasis added). Accordingly, it is determined that the ALJ did create a fully developed record in order to make a finding regarding the existence or nonexistence of bipolar disorder and to "appropriately evaluate the medical evidence and the credibility of Brock A. Martin" in accordance with that finding. <u>Brock v. Astrue</u>, 4:09-CV-2528, (Doc. 21, pp. 14-15) (M.D. Pa. 2010) (Muir, J.).

However, Martin's current argument is that the ALJ did not and should have fully developed the issue of medication compliance. At the hearing, the ALJ asked Martin what his current medication and therapy regimen were and if he went "in for medication checks." Tr. 504. Subsequently, Martin's counsel was provided adequate time to question Martin and his mother regarding his symptoms and medication compliance. Tr. 505-512. Plaintiff's counsel was given adequate opportunity to place testimony and evidence into the record regarding Martin's symptoms or difficulty in medication compliance. Defendant validly points out that there is nothing of record, in the medical records or the testimony, that suggests Martin was incapable of

making an informed decision about whether or not to take medication, nor anything to support

that he was incapable of adhering to a medication regimen, and accordingly, the ALJ was not

required to consider such an incapability in assessing Plaintiff's credibility. If it were applicable,

Martin should have set forth evidence establishing "anosognosia." Even when relying on a

claimant's failure to stick to a medication regimen, an ALJ does not have a duty to inquire about

difficulty with medication compliance with every claimant, particularly when the medical records

indicate "consistent" medical compliance in which the patient has great deference in his choice

of prescription treatment. See (Doc. 12, p. 12) (Claimant describes his medication compliance as

consistent.). Further, such an inquiry was not a directive of this Court's remand order.

Accordingly, it is determined that the ALJ sufficiently developed the record in this matter, and

allowed Martin an opportunity to present his claim.

Martin's second argument is that the ALJ substituted her own opinion for that of a

psychiatrist. (Doc. 12, pp. 12-13). Martin specifically argues that the ALJ's opinion "that

Plaintiff's symptoms, periods of decomposition, and work place issues are all due to medication

compliance and nothing else is her opinion not a psychiatric opinion." (Doc. 12, p. 12)

(emphasis added). Upon review, this Court concludes that the ALJ's finding is not as Martin

characterizes it. The ALJ did consistently, at Step Five, highlight in italics Martin's "poor

medication compliance." Tr. 340-343. However, the ALJ also on multiple occasions noted that

despite Martin's noncompliance, his examinations were normal with no evidence of

decompensation. Tr. 342-343. The ALJ greatly relied on GAF scores which "reflect that the

claimant's symptoms were consistent, despite the fact that he had been non-compliant with his

medications, at times, for months." Tr. 343. The ALJ's determination that Martin consciously

did not comply with his medication regimen was not the "lynchpin" of the ALJ's decision regarding disability, as Martin alleges. The ALJ analysis reflects a careful review of the medical records, credibility determinations, and a finding that "[t]he totality of the evidence establishes that the claimant's impairments are not severe such that they preclude him from performing work-related tasks on a continuous and sustained basis." Tr. 340. This Court's review of the medical records discerned no medical providers' concerns about Martin's inability to comply with his prescription regimen, but rather notations which demonstrate Martin's active role in medication choice and compliance. Further, nowhere is it seen, nor does Martin highlight, where his treating medical personnel contradict the ALJ's determinations on Martin's capabilities or his residual functional capacity. Scrutinizing the record as a whole, there is substantial, relevant evidence adequate to support the ALJ's ultimate conclusion: that "[t]he objective medical evidence of record simply does not support the claimant's alleged level of incapacity" and "establishes that the claimant's impairments are not so severe such that they preclude him from performing work-related tasks on a continuous and sustained basis." Tr. 340-41; see also Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938) (Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

Martin also generally argues that fairness should prevent an ALJ from drawing inferences about a claimant's symptoms and their functional effects from a failure to comply with medical treatment without considering any explanation for that failure or raising the issue sua sponte at the hearing. (Doc. 12, p. 14); (Doc. 19, p. 8). Specifically, Martin submits that "[b]efore finding Plaintiff not credible based on medications he was not taking, the ALJ should have questioned Plaintiff in order to determine whether there are good reasons" and that "[f]ailure to do so is

error." (Doc. 12, p. 14), citing Fair v. Bowen, 885 F.2d 599, 602 (9th Cir. 1989). The Ninth

Circuit Court of Appeals case cited by Martin holds that an ALJ may not "rely on the claimant's

failure to take pain medication where evidence suggests that the claimant had a good reason for

not taking medication." Fair, 885 F.2d at 602 (holding that in order to disbelieve claims of

excessive pain an ALJ must make specific findings), citing Gallant v. Heckler, 753 F.2d 1450,

1455 (9th Cir. 1984). The Undersigned has not found and Martin has not highlighted any part of

the medical record that indicates he has a medical condition that causes a failure in medication

compliance, and Martin offered no testimony or medical opinions to that effect. It was not the

ALJ's duty to set forth or seek out such evidence under these circumstances[9], and the ALJ's

failure to do so is not error. Under the Social Security Regulations, if treatment can restore a

claimant's ability to work, such treatment must be followed, and if a claimant does not follow the

prescribed treatment "without a good reason," he/she will not be found disabled. 20 CFR §

404.1530; see also Fair, 885 F.2d at 603 (A claimant's failure to assert a reason or to explain

adequately a failure to follow a prescribed course of treatment can cast doubt on the sincerity of

claimant's symptoms.). The caselaw cited by Martin utilizes "a more lenient, subjective

definition" of "justifiable cause" for mentally ill claimants who do not follow prescribed

treatment. Benedict v. Heckler, 593 F. Supp. 755, 761 (E.D. NY 1984); see also Pates-Fires, 564

---

9. There may be instances in psychological disorder claims where an ALJ should inquire into reason's for a claimant's medication noncompliance. See 1996 SSR LEXIS 4, at * 22 (SSR 1996) (The ALJ must consider "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner."). The record before the Court is not one of those instances.

F.3d at 946 (holding the ALJ's decision that claimant's medical noncompliance was not justifiable was not supported by substantial evidence and noting "there is no medical evidence, i.e., a discussion by a doctor or other professional, which indicates [claimant's] noncompliance at any time was a result of something other than her mental illness"[10]). However, none of the cases cited stand for the premise that the ALJ is required to inquire into a "good reason" when there is no evidence that the claimant's noncompliance is due to his condition. Under these circumstances, the burden is with the claimant to set forth good cause in testimony or medical evidence.

As Martin points out in his brief, "Northeast Counseling Services spanning years of treatment reflect <u>consistent</u> but not perfect adherence to taking a range of prescribed medications" and "<u>consistent</u> participation in counseling therapy." (Doc. 12, p. 12) (emphasis added). Although the Undersigned understands that treatment of psychiatric disorders is dynamic and will include periods of flux in treatment, the records reflect that Martin can and has consistently adhered to his medical plan. The vocational expert concluded that Martin, when compliant with his treatment regimen, which is a majority of the time ("consistent"), can perform medium duty jobs, including work as a dishwasher, janitorial helper, and auto detailer. Tr. 514. Accordingly, the ALJ's decision will be affirmed.

---

10. Pates-Fires had GAF scores of 10 and 38 and was above 50 only four out of twenty-one times in a six-year period, and Pates-Fires had extended periods of hospitalization. <u>Pates-Fires</u>, 564 F.3d at 937-39, 944. Also, Pates-Fires' treating physician, the only psychiatrist to address her work-related capacity, concluded she was permanently disabled from any type of employment. <u>Id.</u> at 947.

**Conclusion**

The Court's review of the administrative record reveals that the decision of the

Commissioner is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g),

the decision of the Commissioner will be affirmed.

An appropriate order will be entered.


Dated: March 25, 2014

United States District Judge